# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| ANGELA FIELDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. CV414-286 |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Alleging disability "due to residuals of a stroke, high blood pressure, and seizures," plaintiff Angela Fields seeks judicial review of the Social Security Commissioner's denial of her application for a period of disability and Disability Insurance benefits (DIB). Doc. 10 at 4.[1] That denial followed her exhaustion of administrative remedies, so her claims are now ripe for judicial review.

---

[1] "Doc." citations use the docket and page numbers imprinted by the Court's docketing software. Those do not always line up with each paper document's printed pagination. "Tr." citations, on the other hand, use the page numbers in the bottom right corner of the administrative record, which is located on the docket at Doc. 6.

# I. GOVERNING STANDARDS

In social security cases, courts:

> review the Commissioner's decision for substantial evidence. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (quotation omitted). . . . "We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner." *Winschel*, 631 F.3d at 1178 (quotation and brackets omitted). "If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation omitted).

*Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).

The burden of proving disability lies with the claimant. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). In response to the showing the claimant makes, the ALJ applies

> a five-step, "sequential" process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(1). If an ALJ finds a claimant disabled or not disabled at any given step, the ALJ does not go on to the next step. *Id.* § 404.1520(a)(4). At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). At the second step, the ALJ must determine whether the impairment or combination of impairments for which the claimant allegedly suffers is "severe." *Id.* § 404.1520(a)(4)(ii). At the third step, the ALJ must decide whether the claimant's severe impairments meet or medically equal a listed impairment. *Id.* § 404.1520(a)(4)(iii). If not, the ALJ must then determine at step four whether the claimant has the RFC to perform

her past relevant work. *Id.* § 404.1520(a)(4)(iv). If the claimant cannot perform her past relevant work, the ALJ must determine at step five whether the claimant can make an adjustment to other work, considering the claimant's RFC, age, education, and work experience.[1] An ALJ may make this determination either by applying the Medical Vocational Guidelines or by obtaining the testimony of a VE. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011).

*Stone v. Comm'r. of Soc. Sec. Admin.*, 596 F. App'x, 878, 879 (11th Cir. 2015) (footnotes added).

"For DIB claims, a claimant is eligible for benefits where she demonstrates disability on or before the last date for which she were insured. 42 U.S.C. § 423(a)(1)(A) (2005). Because [Fields'] last insured date was December 31, [2015 (tr. 19)], her DIB appeal requires a showing of disability on or before that date." *Moore*, 405 F.3d at 1211.

## II. BACKGROUND

Fields, 53 when the ALJ denied her DIB application (Tr. 32, 50), has

---

[1] At steps four and five, the ALJ assesses the claimant's residual functional capacity (RFC) and ability to return to her past relevant work. *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). RFC is what "an individual is still able to do despite the limitations caused by his or her impairments." *Id.* (citing 20 C.F.R. § 404.1545(a); *Moore v. Comm'r of Soc. Sec.*, 478 F. App'x 623, 624 (11th Cir. 2012). "The ALJ makes the RFC determination based on all relevant medical and other evidence presented. In relevant part, the RFC determination is used to decide whether the claimant can adjust to other work under the fifth step." *Jones v. Comm'r of Soc. Sec.*, 603 F. App'x 813, 818 (11th Cir. 2015) (quotes and cite omitted).

a high school education (Tr. 51) and past work experience as a bus and truck driver. Tr. 31, 201. Now 55, she suffers a variety of ailments traceable to a September 14, 2010 cerebral artery ischemic stroke. Seizures, left sided weakness, and left hemiparesis occurred in the stroke's immediate aftermath, Tr. 24, 388, while residuals like psychomotor delays and continued left sided weakness allegedly trouble her today. *See* doc. 10 at 5. She never returned to work. *Id.*

When the stroke and accompanying seizure hit, Fields received treatment and medication that stabilized her condition enough[2] to enable inpatient rehabilitation rather than surgical intervention.[3] Tr. 425. When admitted to rehab, her "[m]ental status testing and higher cortical function testing [was] normal," although her "[l]eft upper extremity strength [was] 4/5 and left lower extremity strength, 4.5/5." Tr. 426. Rehab lasted for approximately ten days post-stroke and Fields

---

[2] In fact, upon her admission to rehab, Dr. Eugene LaFranchise observed that Fields had "exhibited a tremendous clinical improvement," and that "[c]ontinued clinical improvement is expected." Tr. 427.

[3] The emergency room physician who initially treated Fields described the stroke as "large," Tr. 422, while her treating neurologist said "huge." Tr. 655. Regardless of the descriptor used, the size of the stroke and risk of herniation led doctors to originally believe she likely needed a right hemispherectomy. *See* Tr. 422. Fields recovered so well and so fast, however, that rehab became a better option. Tr. 425.

"responded well." Tr. 435. She needed some supervision at discharge, but could function at home "at a modified independent level for all mobility skills and all self-care needs." *Id.* What's more, "[h]er neurologic deficits [were] improving at a remarkable pace." *Id.*

Fields thereafter regularly visited her primary care physician, Dr. Vernon Bryant, and neurologists Michael Hemphill and Richard Bodziner. Tr. 23, 484. At a November 4, 2010 visit to Dr. Bodziner -- less than two months after her stroke -- she continued to show neurologic improvement at a "remarkable pace." Tr. 484. "She had a left facial droop, [and] fairly mild left hemiparesis," but "residual deficits [were] fairly mild considering the size of her stroke." *Id.*

By March 2011, Fields demonstrated normal eye movements, "no significant left-sided neglect . . . [and] symmetric gross and fine motor strength throughout," along with left-side reflexes "brisker" than on the right. Tr. 489. According to Bodziner, she was "doing remarkably well functionally, though" she reported poor appetite, left arm numbness, and became more easily fatigued than before the stroke. Tr. 489-90. One month later, in April 2011, "[b]rief mental testing" returned normal

results, as did speech and language testing. Tr. 493.

Fields switched seizure prevention medicines in April 2011. Tr. 499. That caused a tonic-clonic ("grand mal") seizure, her first of any kind since the stroke, but the resultant symptoms faded fast, leaving her with "normal speech, mood and affect, . . . [and] 5/5 strength, except for in her left upper extremity, which ha[d] 4/5 strength." Tr. 501. Because she stopped taking her seizure medication due to allergies, Fields had another seizure in July 2011 while at a funeral in Florida. Tr. 582. Once again, examination showed normal neurological traits (normal memory and motor control, etc.) post-seizure. Tr. 583.[4]

On July 13, 2011, after the Florida seizure, Dr. Kristiansson Roth, a psychologist, evaluated Fields as part of the DIB application process. Tr. 608. Roth interviewed her, conducted a mental status exam, and administered the Wechsler Adult Intelligence Scale ("WAIS") and Wide Range Achievement Test ("WRAT"). Tr. 608. During the interview, Fields' husband claimed that the stroke "messed her head up and some days she does not know what day it is." Tr. 608. She "keeps the water

---

[4]  After her third seizure, Fields saw Dr. Hemphill again. Tr. 645. She continued to suffer mild left hemiparesis, but her speech and language remained fluent, her affect appropriate, and her "[r]ecent and remote memory [were] intact." Tr. 646.

running when she washes thing . . . drops things when she is holding [them,] . . . can't handle money[, and] . . . also . . . leaves the stove on." Tr. 608. Fields stated that she couldn't sit up for long, do things like she used to before the stroke, and was easily distracted. Tr. 608. Claiming to have a headache, Fields at one point "slouched in the interview chair and had limited eye contact." Tr. 609.

On the other hand, Roth reported that Fields presented well and "appeared alert and was cooperative during the interview. She demonstrated good eye contact and rapport was developed." Tr. 610. Her "motor activity was calm[,] . . . speech patterns articulate, . . . mood was euthymic[, and] . . . overall presenting level of energy [was] adequate." Tr. 610.

During the mental status exam, Fields "was able to sustain attention and carry out immediate goal directed behavior." Tr. 610. She got lost going from one room to another, but otherwise "was able to attend to the surroundings, fill out paperwork and track conversation." Tr. 610. "[W]hen it came to performing specific tasks," however, Fields "promoted difficulties in concentration" and "just shut down." Tr. 610.

She even gave up trying to spell her own name backwards, something that "most mildly mentally challenged individuals can perform." Tr. 610.

The WAIS and WRAT tests did not go much better, as Fields' "performance was influenced by a suppression of effort and lack of motivation." Tr. 611. "[H]er scores [were] suppressed due to [Fields] giving up and not trying hard, often stating she was unable to focus, even though she was able to focus and stay on task during the mental status and intake sessions." Tr. 612. Consequently, the results "underestimate" Fields' "potential." Tr. 611. From the intelligence tests and other exams, Roth concluded that Fields likely could "adhere to a normal work schedule and maintain an adequate pace in a work setting," and likely would not "decompensate under normal levels of change, stress and expectations." Tr. 612.

Doctors Arthur Lesesne and Louis Saddler, both of whom performed residual functional capacity assessments in 2011, agreed. In particular, though he acknowledged mild left hemiparesis and gait instability, Lesesne saw "no significant left sided neglect," and concluded that Fields' allegations were only "partially credible" because her symptoms' severity

"do not coincide with the medical records." Tr. 634. Both Lesesne and Saddler viewed Fields as "doing remarkably well functionally," and without significant limitations other than a need to avoid heavy machinery and ladders. Tr. 634, 709.

Roth's, Lesesne's, and Saddler's reviews and exams stand in contrast to the March 2013 evaluation conducted by Dr. Daniel Grant, a neuropsychologist, at the behest of Fields' then-attorney, Robert Rosenblum. Grant tested her in a variety of ways[5] and found (1) her executive functions impaired; (2) difficulty with sustained and focused attention; (3) very slow information processing; (4) visual-spatial skill deficits; and (5) left-sided weakness; and (6) poor planning, organization, and problem solving, all of which "significantly impaired her level of functioning." Tr. 777-78.

Grant wasn't the only person whose opinion diverged from Dr. Roth's. Dr. Jessica Carter, one of Fields' treating neurologists and

---

[5] Grant administered a structured clinical interview, the Denman Neuropsychological Memory Scale, a verbal fluency test, grip strength test, grooved pegboard test, vocabulary and block design subtests from the WASI-II, Rey Complex Figure with Recognition, Reitan Trails A, B, and C, Benton's Visual Form Discrimination, Benton's Judgment of Line Orientation, and a behavior rating inventory. Tr. 775. His report, however, only discusses a couple of those tests.

colleague of Drs. Bodinzer and Hemphill, opined in December 2011 that Fields had "difficulty with intermittent headaches, left arm pain and numbness, memory and concentration issues and a mild left hemiparesis."[6]  Tr. 712 (also concluding that Fields "continues to be disabled").  Carter issued another (almost verbatim) terse statement to the same effect in January 2013.  Tr. 767.

One month later, Carter, in response to a request from Rosenblum, commissioned a functional capacity evaluation ("FCE") by physical therapist Heidi Prado.  *See* Tr. 774 (Carter letter to Rosenblum concurring with the FCE's results).[7]  Prado administered a variety of physical tests (climbing stairs and the like) and concluded that Fields could not "tolerate a physical demand level of sedentary work."  Tr. 773. She found that Fields lacked "the ability to safely handle 10 pounds of force," "had significant difficulty with left upper extremity fine motor skills," and "demonstrated decreased mental function for complex tasks."

---

[6]  By contrast, just two months prior, Carter's own neurological examination revealed normal mental status, including speech and language, "mild left-sided facial droop," "[v]ery mild left hemiparesis," but with strength otherwise intact, and a normal gait. Tr. 714.

[7]  Bryant, Fields' PCP, also concurred with Prado's FCE results.  Tr. 781.

Tr. 773. By 2014, however, even Carter acknowledged that Fields had "made tremendous strides," though "she is left with some deficits that [Carter] fe[lt] are permanent," such as left side weakness, some memory loss, and "lasting deficits in visual-spatial reasoning." Tr. 788.

## III. ANALYSIS

Fields protectively filed for DIB on April 28, 2010, alleging a disability onset of September 14, 2010. Tr. 161. Following administrative denial, she attended and testified at a hearing on February 5, 2013 before the ALJ, who later denied her application. Tr. 32. Although the ALJ found that her stroke residuals and seizure history constituted severe impairments (Tr. 21), he concluded, after consulting a vocational expert, that she retained the RFC for light work with some exceptions. Tr. 23. Even considering that Fields "closely approached advanced age," the ALJ thus found her "not disabled" because jobs that she could perform exist in significant numbers in the national economy. Tr. 31.

To Fields, that's error. First and foremost, she argues that the ALJ failed "to evaluate all the [medical opinion] evidence, relie[d] on opinions

with the least support, [and thus] his decision is unsupported by substantial evidence." Doc. 10 at 8. In particular, she criticizes the ALJ's rejection of Grant's opinion, which, she says, is based on a thorough, detailed report that jibes with the findings of her treating physicians and is otherwise consistent with record evidence. *Id.* at 13. Beyond improperly weighing Grant's opinion, the ALJ also allegedly erred by (1) placing great weight on Roth's report (*id.* at 13); (2) rejecting Prado's FCE and two treating physicians' concurrences (*id.* at 15); and (3) applying incorrect legal standards to determine that Fields lacked credibility. *Id.* at 18. Each issue is discussed in turn, but, as the Commissioner correctly notes, each is without merit.

## A. The Grant Report

Fields specifically complains that the ALJ failed to properly weigh Grant's report given the mandate that well-supported and explained medical opinions receive greater weight than conclusory ones. Doc. 12 at 2; 20 C.F.R. § 404.1527(c)(3). Regardless of weight given, Fields contends the ALJ also failed to adequately explain his decision to lightly consider Grant's evaluation, including by not taking into account its

consistency with other opinions. *See* doc. 10 at 12-13. To say an ALJ's decision under those circumstances is supported by substantial evidence, says Fields, "approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Winschel*, 631 F.3d at 1179.

"Social Security regulations require the ALJ to consider many factors when evaluating medical opinion evidence. *See* 20 C.F.R. § 404.1527(d)." *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015). The more well-explained and well-supported an opinion is, the more weight it receives. 20 C.F.R. § 404.1527(c)(3). And, "the more consistent an opinion is with *the record as a whole*, the more weight" it garners. *Id.* at (c)(4) (emphasis added).

Overlaying all that is the principle that "the opinions of examining physicians are given more weight than those of non-examining physicians, treating physicians are given more weight than those of physicians who examine but do not treat, and the opinions of specialists are given more weight on issues within the area of expertise than those of

non-specialists."[8] *McNamee v. Soc. Sec. Admin.*, 164 F. App'x 919, 923 (11th Cir. 2006). Non-examining, consultative physicians are due the least weight, though the regulations still require that the ALJ consider their opinions and determine that weight based upon their consistency with the evidence of record. 20 C.F.R. § 404.1527(f); *see also Tapley v. Colvin*, 2015 WL 764022 at * 3 (S.D. Ga. Feb. 23, 2015) ("As a general rule, the opinion of a one-time examiner is not entitled to great weight and may be discredited by other evidence in the record.") (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004)).

Substantial evidence exists in the record to support the ALJ

---

[8] Importantly, the treating-examining-consulting hierarchy does not mandate that an ALJ always weight a treating physician's opinion more than the others. Good cause exists to deviate from the general weighting rules if:

> 1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1240–41 (11th Cir.2004). Therefore, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

*Farkas v. Astrue*, 2012 WL 750547 at * 6 (M.D. Fla. Mar. 8, 2012).

affording Grant's opinion little weight.[9] To begin, Grant, a neuropsychologist, never treated Fields -- he examined her and administered a battery of tests. Tr. 775-78. And although he thoroughly evaluated Fields, supported his conclusions with testing data, and provided well-reasoned explanations for his findings, his report is, as the ALJ noted, inconsistent with other record evidence.

For example, a mere fifteen days after her stroke, Dr. LaFranchise, the physician who admitted her to rehab when it became apparent that her improvement negated the need for neurosurgery, noted that Fields "exhibited a tremendous clinical improvement," and that "[c]ontinued clinical improvement is expected." Tr. 427. At that time, too, her "higher cortical function testing [was] normal," and she had very little extremity strength loss. Tr. 426.

Two months after the stroke, her treating neurologist, Dr. Bodziner -- whose opinion, absent good cause, must be afforded

---

[9]  Fields argues that the Government's failure to mention, much less discuss, Grant's opinion indicates an error concession. *See* doc. 12 at 2. Not so. Although omitting Grant entirely from its brief is indeed an odd decision by the Government, it does not signal a concession. Even if it did, the parties do not have the power to concede away legal decisions -- like whether the ALJ's decision is supported by substantial evidence -- properly within the Court's province.

controlling weight, *Farkas*, 2012 WL 750547 at \* 6 (citing 20 C.F.R. § 404.1527(d)(2)), observed that she had "fairly mild left hemiparesis," but her "residual deficits [were] fairly mild considering the size of her stroke." Tr. 484. Six months post-stroke, Fields improved further. Her eyes moved normally, she had "no significant left-sided neglect," and Bodziner opined that she was "doing remarkably well functionally." Tr. 489-90. April 2011 mental, speech, and language testing returned normal results, Tr. 493, while a doctor in Florida who never previously treated Fields found normal memory and motor control in July 2011. Tr. 583; *see also* Tr. 646 (treating neurologist Hemphill observed normal recent and remote memory after Fields' Florida seizure). In the face of that inconsistent, objective evidence, the ALJ did not err by discounting Grant's opinion.[10]

---

[10] Notably, in summarizing Fields' medical history, Grant failed to mention any of the above listed provider opinions. *See* Tr. 775-76. He focused solely on those opinions that cast Fields' recovery in a negative light. *See, e.g.*, Tr. 776 (recounting Fields' PCP's negative outlook and Prado's FCE which stated that Fields couldn't perform even sedentary work).

Also recall that even if record evidence preponderates against the ALJ's conclusion, this Court cannot reverse if it's nevertheless supported by substantial evidence. *See Mitchell*, 771 F.3d at 782. Certainly evidence exists that would support weighting Grant's opinion more than did the ALJ. But, substantial evidence

## B. The Roth Report

Flipping the Grant script, Fields contends that the ALJ improperly afforded Dr. Roth's opinion too much weight. *See* doc. 10 at 13-15. She complains that Roth lacked access to all the records that Grant reviewed and thus Roth's opinion should be weighted less, particularly since Grant is a neuropsychologist while Roth lacks a specialty. *Id.* at 14-15.

Although true that Roth did not review all the record evidence (*see* doc. 11 at 16; Tr. 608), that's not a deal-breaker. The ALJ reviewed all the evidence and found Roth's opinion supported and consistent with the record as a whole. Tr. 33. That conclusion itself is supported by substantial evidence [11] and, therefore, the ALJ's

---

also exists that supports his decision. Given that state of affairs, his decision to discount Grant's opinion must stand.

Nor did the ALJ, as Fields contends, fail to adequately explain his decision to discount. ALJs indeed "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179. But that's precisely what the ALJ here did. He (1) afforded Grant's opinion "little weight" (*i.e.*, stated with particularity the weight given); and (2) explained that he did so because it was inconsistent with other record evidence, not to mention Fields' ability to drive. Tr. 28-29.

[11] Roth's "variable informant" conclusion (tr. 612) finds companions in Lesesne's

decision to afford Roth's opinion great weight, cannot be disturbed. *See T.R.C. ex rel Boyd v. Comm'r, Soc. Sec. Admin.*, 553 F. App'x 914, 917-18 (11th Cir. 2014) (ALJ entitled to accord non-examining physician substantial weight because the record supported his explanations for his conclusions); *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (ALJs may reject any physician's opinion when record evidence supports a contrary conclusion).

## C. Fields' Treating Physicians and the FCE Therapist

The ALJ's decision to discount Prado's FCE and Carter's and Bryant's [12] concurrences with that evaluation also comes in for criticism. In particular, Fields attacks the ALJ's alleged failure to

---

and Saddler's assessments. Both doctors viewed Fields as "doing remarkably well functionally," tr. 634, and without significant limitation. Tr. 709. Lesesne also saw "no significant left-sided neglect," and found Fields only partially credible because her severity allegations diverged from what the medical records suggested. Tr. 634. Roth concluded the same. Tr. 611. Hence, substantial evidence supports the ALJ's conclusion that his opinion was consistent with other record evidence and thus entitled to greater weight. *See Mitchell*, 771 F.3d at 782 ("Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion.").

[12] Recall that Prado is a physical therapist commissioned by Carter, one of Fields' treating neurologists, to conduct an FCE. *See* Tr. 774. Carter only sent Fields to Prado "[i]n order to respond" to Fields' attorney's request "for a more detailed statement about Ms. Fields' physical work-related limitations." Tr. 774. Bryant is Fields' PCP. Tr. 484.

"evaluate the consistency of [the FCE, and Bryant's and Carter's] upper left extremity findings or acknowledge that Dr. Carter's treatment notes reflect Fields's complaints of left arm pain and numbness, and documented decreased hand-finger movements and diminished fine touch on exam." Doc. 10 at 17. She then concludes, without offering any supporting authority, that "the ALJ's decision to give little weight to the FCE" and Carter and Bryant's "agreement with the [its] findings . . . is not supported by substantial evidence." *Id.*

Once again, not so. As the ALJ observed, the record indeed reflects inconsistency between those three opinions and objective medical evidence. *See supra* n. 11. That's substantial evidence. *See Mitchell*, 771 F.3d at 782. The ALJ's failure to comment on the consistency between the FCE, Carter's, and Bryant's opinions violated no regulation[13] and thus does not undermine that conclusion.

---

[13] Under 20 C.F.R. § 1527(c)(4), as a *general* rule (*i.e.*, not in all situations) "the more consistent an opinion is with *the record as a whole*, the more weight . . . will [be] give[n] to that opinion." (emphasis added). An opinion's consistency with one or two other opinions (or anything less than the entire record) does not, by the text of § 1527(c)(4), require an ALJ to grant it greater weight.

## D. Fields' Credibility

Fields contends that the ALJ's skepticism of her subjective limitation allegations lacks substantial evidentiary support. Docs. 10 at 18-19; 12 at 8. Where, as here, a claimant attempts to establish disability through her own testimony of subjective limitations, the "pain standard" applies. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). That demands:

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Watson v. Colvin*, 2015 WL 8467014 at * 6 (S.D. Ga. Nov. 18, 2015) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).

Claimants like Fields may rely on their own subjective testimony of pain, which, if supported by medical evidence, would be sufficient to establish disability. But at the same time, an ALJ is free to discredit that testimony. *Id.*[14] He need only "articulate [his] explicit and

---

[14] As the Eleventh Circuit explained:

adequate reasons for doing so." *Id.*

The ALJ did that here. He evaluated Fields' credibility and gave sufficient reasons for concluding that her subjective complaints were not entirely credible. His credibility findings were both explicit and supported by citation to specific evidence. An example: "Even giving the claimant some deference, and although [she] described daily activities which are fairly limited . . . it is difficult to attribute that degree of limitation to [her] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." Tr. 30.

It remains the ALJ's province to determine a claimant's credibility so long as he explains his credibility determination. *Holt*, 921 F.2d 1221, 1223-24 (11th Cir. 1991). He has highlighted contradictions in

---

The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050 (11th Cir. 1986); *Landry*, 782 F.2d at 1152. If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so. *Hale*, 831 F.2d at 1011. Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Hale*, at 1054; *MacGregor*, 786 F.2d at 1054.

*Holt*, 921 F.2d at 1223.

Fields' statements and the record, *see* Tr. 29, which a reasonable person, *see Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983), could conclude supports finding her not credible. *See Moore*, 405 F.3d at 1212 (inconsistencies between claimant's descriptions of daily activities and claimed infirmities supported ALJ's credibility finding). He sufficiently explained his reasoning and the record supports it, which is all that the Commissioner need show here. *See, e.g., Marley v. Comm'r of Soc. Sec.*, 2015 WL 847376 at * 7 (M.D. Fla. Feb. 26, 2015) ("The ALJ therefore sufficiently explained his reasons for finding Plaintiff less than entirely credible, and it is not for the Court to reweigh the evidence nor will the Court disturb a clearly articulated credibility finding that is supported by substantial evidence.").

## IV.  CONCLUSION

The ALJ's conclusion that Fields is "not disabled," tr. 32, therefore should be **AFFIRMED** and this case **DISMISSED WITH PREJUDICE**.

**SO REPORTED AND RECOMMENDED**, this 28ᵀᴴ day of

January, 2016.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA